[No. 49841-5.   En Banc.   February 2, 1984.]

THE DEMOCRATIC PARTY OF WASHINGTON, ET AL,
*Petitioners*, v. JOHN SPELLMAN,
*as Governor*, ET AL,
*Respondents*.

*Wickwire, Lewis, Goldmark & Schorr*, by *Charles A. Goldmark, O. Yale Lewis, Kevin F. Kelly*, and *B. Gerald Johnson*, for petitioners.

*Kenneth O. Eikenberry, Attorney General*, and *Edward B. Mackie, Chief Deputy*, for respondents.

*Daniel B. Ritter* on behalf of the Republican Party, amicus curiae.

[As amended by order of the Supreme Court May 24, 1984, modifying the dissenting opinion.]

PER CURIAM.—By order dated September 9, 1983, this court denied petitioner's request for the issuance of an alternative writ of mandamus directing respondents to cause a partisan primary election for the office of United States Senator to be held on a date between October 4 and 11, 1983, or in the alternative an alternative writ of mandamus directing respondents to establish a special 5-day filing

and withdrawal period for candidates commencing September 26, 1983. The foregoing request was occasioned by the death of Senator Henry M. Jackson. In denying this request, our order indicated that an explanatory opinion would follow. Immediately following the entry of the order, however, the Washington State Legislature enacted Senate Bill 4279, 48th Legislature (1983), which provided for a primary election to be held on October 11, 1983. This legislation resolved all issues raised in this case. An opinion discussing these issues under prior law would have no precedential significance. We have therefore concluded that it is unnecessary to file an explanatory opinion.

DORE, J. (dissenting)—By Supreme Court order under date of September 9, 1983, the majority of this court denied petitioner's request for the issuance of a writ of mandamus directing respondents to cause a partisan primary election for the office of United States Senator.

I dissented, alleging that constitutional guaranties require a partisan primary prior to the general election.

The majority of this court now feels that subject case is moot and no further opinion need be issued. I disagree. While Senate Bill 4279 resolved the immediate issues of this action, a moot case may nonetheless be decided if it involves matters of continuing and substantial public interest. The criteria to be considered in determining whether a sufficient public interest is involved are: (1) the public or private nature of the question presented; (2) the desirability of an authoritative determination which will provide future guidance to public officers; and (3) the likelihood that the question will recur. *In re Cross,* 99 Wn.2d 373, 662 P.2d 828 (1983); *Sorenson v. Bellingham,* 80 Wn.2d 547, 496 P.2d 512 (1972).

Nowhere is there a more substantial public interest than in the sanctity of our electoral process. I believe that this court must guarantee, where the Legislature has failed to provide, that we elect our public officials by an orderly voting process in compliance with constitutional mandate.

There necessarily exists a strong desirability of an authoritative determination of these issues which will provide future guidance to our state officials for establishing partisan primary elections. This court cannot defer its responsibilities in the hope that the Legislature will take emergency action to design election procedures that meet constitutional mandates. If our democratic system, as we know it, is to survive, our court should not hesitate to act on constitutional issues to ensure the sanctity of the ballot box.

I

The election ordered by Governor Spellman, as advised by the Attorney General, contemplated a partisan election with no preceding primary. The Governor's writ provided that we dispense with the state primary election and, in its place, there be 3 days of *open* filing in which any person could file as a candidate of any party. Persons would be allowed to nominate themselves as candidates of a major political party merely by filing a declaration of candidacy. Party members and members of the public would have no opportunity to determine which candidates are to represent each major political party. Multiple candidacies claiming to represent the Democratic and Republican parties would occur.

The principal contention put forward by the Attorney General for not calling for a primary election was that there was insufficient time to effectuate an orderly election process which encompassed both a primary and general election. It is interesting to note that within a week of this court's order, the Legislature met in emergency session and set a primary election to be held on October 11, 1983. This legislation effectively refuted the timeliness issue propounded by the Attorney General.

The election procedure contemplated by the Governor's writ would certainly have created chaos, made a mockery of the State's political process, and elected a United States Senator by a small minority of the State's voters.

The seventeenth amendment to the United States Con-

stitution provides for the direct election of Senators. It also addresses the problem of vacancies, as follows:

> When vacancies happen in the representation of any state in the senate, the executive authority of such state shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any state may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

Washington's statute implementing the Seventeenth Amendment is RCW 29.68.070, which provides:

> When a vacancy happens in the representation of this state in the senate of the United States the governor shall make a temporary appointment until the people fill the vacancy by election at the next ensuing general state election.

The election process, as contemplated by the Governor's writ, would apparently permit as many persons as are interested to file for the Senate position as Republicans or Democrats. The names of all of these persons, together with any qualifying minor party or independent candidates, would then appear on the November 8 election ballot. The individual who receives the most votes, even if only a plurality, would be the winner.

The Governor's electoral scheme was not in accordance with law. The office of United States Senator is a partisan elective office under Washington law. *See, e.g.,* RCW 29.30-.091, .390.

The essence of a partisan elective office is that elections for it are contested either by candidates nominated by political parties or by independent candidates who speak for themselves and owe allegiance to no party. A fundamental principle of Washington's electoral law is that in a partisan election there shall be only one nominee from each political party. The law of this state is clear that when a primary election is feasible, nominations for partisan office shall be by primary election.

Washington election law acknowledges the different roles of minor and major political parties in the election process.

For example, the major parties select candidates by means of partisan primaries under RCW 29.18 while the minor parties generally proceed by nominating convention in accordance with RCW 29.24. Furthermore, only the major parties have the statutory authority to fill vacancies on their tickets. RCW 29.18.150.

This recognition of the special roles played by major parties is, of course, in accord with the long–established 2–party political system which has existed throughout most of the history of the United States. This system can be contrasted with the election process commonly used in European countries which involves multiple minority parties which form majorities by joining forces in temporary coalitions.

A political party's selection of nominees for an election plays a crucial role in the electoral system. "Indeed, the nomination of candidates by the major parties has been called the 'most critical stage' of the electoral process." *Developments in the Law—Elections,* 88 Harv. L. Rev. 1111, 1151 (1975).

Washington's general statutory election scheme provides for a narrowing of the field of candidates by primary election. In fact, a careful examination of Title 29 of the Revised Code of Washington reveals that primaries are an integral part of the orderly election process which Washington law creates. RCW 29.13, for example, is devoted solely to establishing procedures for holding primaries. RCW 29.13.070 provides that:

Nominating primaries for general elections to be held in November shall be held at the regular polling places in each precinct on the third Tuesday of the preceding September or on the seventh Tuesday immediately preceding such general election, whichever occurs first.

There are statutes which specifically deal with the procedure to be followed when an election must be held to fill a vacancy which arose too late in the election cycle for candidates to comply with the regular election procedures. RCW 42.12.040 deals with vacancies occurring in partisan elective

offices in the executive and legislative branches of state government and in partisan county elective offices. That statute provides, in part:

> If a vacancy occurs . . . before the fourth Tuesday prior to the primary for the next general election following the occurrence of the vacancy, a successor shall be elected to that office at that general election. Except during the last year of the term of office, if such a vacancy occurs on or after the fourth Tuesday prior to the primary for that general election, the election of the successor shall occur at the next succeeding general election. The elected successor shall hold office for the remainder of the unexpired term.

RCW 41.12.040 reflects the legislative judgment that it is better to delay the election of a successor than to hold a general election which is not preceded by a properly conducted primary.

Similarly, the statute governing appointments to fill vacancies in the United States House of Representatives reveals the great importance of primaries in conducting orderly elections. RCW 29.68.080 provides, in part:

> Whenever there is a vacancy existing by death, resignation, disability or failure to qualify or impending vacancy in the office of representative in the congress of the United States from this state or any congressional district in this state, the governor shall order a special election to fill the vacancy. Within ten days of such vacancy occurring he shall fix as the date for the special election a day not less than ninety days after the issuance of the writ. He shall fix as the date for the primary for nominating candidates for the special election, a day not less than thirty days before the day fixed for holding the special election. . . . If the vacancy should occur later than the second Friday following the close of the filing period, a special primary and special general election to fill such vacancy shall be held after the regular annual general election but, in any event, no later than the ninetieth day following the said November election.

Again, the Legislature has expressed its view that a primary election is such an integral part of the election process that an entirely separate special primary and election must be

held if the vacancy occurs at a time which precludes participation in the regular primary process.

This court should follow the uniformly expressed legislative policy favoring primary elections. This policy accurately reflects the overriding legislative concern that elections be conducted in accordance with orderly mechanisms to assure a fair expression of the voter's choice.

As related above, the Washington Legislature has expressed a strong preference for conducting partisan elections by means of a primary, which is used to narrow the field of candidates, followed by a general election. A similar but distinct legislative policy favors the meaningful participation of the political party system and recognizes the importance of preserving the participation of the major political parties in the election process. One example of this policy is found in RCW 29.18.150, which provides a mechanism by which a major political party can fill a vacancy on its ticket resulting from the failure of any party member to file for a particular elective office. Similarly, RCW 29.18.160 provides for a major political party filling a vacancy on its ticket caused by the death or disqualification of one of its candidates.

The Washington Legislature's recognition of the importance of the major parties is also evidenced by the elaborate statutory framework contained in RCW 29.42, governing the authority of political party organizations and the procedures by which the leadership of such organizations is determined. The importance of participation by the major political parties in particular is evidenced by RCW 29.42-.010(6), which authorizes all political party organizations to perform the functions inherent in such an organization but authorizes only the major political parties to designate candidates to appear on the primary election ballot under RCW 29.18.150.

## II

The election process envisioned by the Governor's writ effectively eliminates party participation in selection of

party candidates, depriving members of the constitutional right of association.

There can be no doubt that the freedom to associate with others for the advancement of political beliefs and ideas is protected activity under the first and fourteenth amendments to the United States Constitution: "The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Cousins v. Wigoda,* 419 U.S. 477, 487, 42 L. Ed. 2d 595, 95 S. Ct. 541 (1975), quoting *Kusper v. Pontikes,* 414 U.S. 51, 57, 38 L. Ed. 2d 260, 94 S. Ct. 303 (1973). The United States Supreme Court has held, moreover, that *Kusper* necessarily presupposes "the freedom to identify the people who constitute the association, and to limit the association to those people only." *Democratic Party of United States v. Wisconsin ex rel. La Follette,* 450 U.S. 107, 122, 67 L. Ed. 2d 82, 101 S. Ct. 1010 (1981). From this it follows, in turn, that a political party has a fundamental interest in ensuring that party members have an effective role in determining who will appear on a general election ballot as their candidate. *Langone v. Secretary of the Commonwealth,* 388 Mass. 185, 446 N.E.2d 43 (1983); *Developments in the Law—Elections,* 88 Harv. L. Rev. 1111, 1151 (1975). As Professor Tribe states:

> There can be no doubt that the political party has a legitimate—indeed, compelling—interest in ensuring that its selection process accurately reflects the collective voice of those who, in some meaningful sense, are affiliated with it. Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being.

(Footnote omitted.) L. Tribe, *American Constitutional Law* § 13–24, at 791 (1978).

The Governor's writ directed that we dispense with the state primary election and, in its place, there be 3 days of *open* filing in which any person could file as a candidate of any party. Such a directive, obviously, does more than sim-

ply "impair" the party's critical function in nominating candidates; it does away with it entirely, and if inclusion of persons of adverse political principles can seriously distort the collective decisionmaking of a party, how much more distorted will be the result where the party has been stripped of any voice whatsoever in determining who is to be its candidate. A rule which would allow persons having only tenuous affiliations with the party to present themselves as its candidate wholly undermines the party members' associational rights to identify those who best represent the party's principles and to limit its candidates to those persons.

In *Cousins v. Wigoda, supra,* the United States Supreme Court held that a state court injunction which would have required, in effect, that the National Democratic Party seat delegates not chosen in accordance with party guidelines was a significant and unconstitutional interference with protected rights of political association, unjustified by the state's asserted interest in maintaining the overall integrity of the electoral processes. *Cousins,* at 487–88.

Six years later in *Democratic Party,* the Court held that the Democratic Party of the United States (National Party) could, in order to protect itself from intrusion by persons with "adverse political principles," refuse at convention to seat delegates bound under state law to vote in a manner inconsistent with party rules. Delegate selection rules of the National Party provided that only those willing to affiliate publicly with the party could participate in the selection of delegates to the national convention. Wisconsin delegates were required by state law, however, to vote at the national convention in accordance with the votes of an open primary in which persons not affiliated with the National Party or any party could vote.

When the National Party refused to seat Wisconsin's delegates, the State sought a declaration that the Wisconsin delegate selection scheme was constitutional as applied to the party and that the party could not lawfully refuse to seat the Wisconsin delegation. In rejecting the State's

claims, the Court reaffirmed the freedom to associate for the common advancement of political beliefs and recognized that the inclusion of Wisconsin's delegates in the convention processes could have seriously distorted its collective decisions, "thus impairing the party's essential functions . . ." 450 U.S. at 122.

In *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 59 L. Ed. 2d 230, 99 S. Ct. 983 (1979), the Supreme Court held unconstitutional a requirement of the Illinois election code regulating access to ballots by new political parties and individual candidates. The Court found that the restrictions, which imposed a signature requirement on new parties and individuals before they would be allowed access to the ballot, burdened the fundamental rights to associate for the advancement of political beliefs and to cast votes effectively. The freedom to associate as a political party, a right we have recognized as fundamental, has diminished practical value if the party can be kept off the ballot. Similarly, the freedom to associate as a political party has greatly diminished practical value if numerous persons can designate themselves on the ballot as candidates for the same office affiliated with the same party in the same general election, while the party itself is denied the opportunity to designate one candidate as its official representative.

Thus, in *Langone v. Secretary of the Commonwealth, supra,* the court refused to strike down a state party charter provision which stated, in effect, that only those persons receiving at least 15 percent of the delegate votes at the state convention could appear on the party's primary ballot. The court noted that the winner of a plurality of the party primary would become the party's candidate in the state general election, and that registered voters who signed nominating petitions were not required to be members of the party. Thus, if the 15 percent rule were struck down, a regular party member could be placed on the party ballot as the party candidate. To strike down the 15 percent rule, the court held, would, therefore, substantially infringe upon

the party members' rights of free association.

Had the *Langone* court eliminated the 15 percent rule, the resultant scheme would have been the functional equivalent of the 3–day open filing period as provided by the Governor.

By allowing as many individuals as choose to run for the office of United States Senator to place their names in nomination, including probably several members from each of the major political parties, the Governor would create confusion among the electorate and almost surely guarantee that the next United States Senator would be elected by an insignificant plurality, thus seriously infringing on the effectiveness of the right to vote to which all qualified voters in the state are constitutionally entitled. Such a result is hostile to our democratic system. As the United States Supreme Court stated in *Lubin v. Panish,* 415 U.S. 709, 39 L. Ed. 2d 702, 94 S. Ct. 1315 (1974):

> A procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process. . . .
>
> . . . The means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not.

*Lubin,* at 715, *quoted in Illinois Bd. of Elections v. Socialist Workers Party, supra* at 185; *see Jenness v. Fortson,* 403 U.S. 431, 442, 29 L. Ed. 2d 554, 91 S. Ct. 1970 (1971).

In sum, the effective denial of the right of the major parties and their members to select by primary a respective single candidate for the office of Senator to advance the shared political beliefs and goals of the respective party and its members seriously burdens the constitutionally protected right of political association guaranteed to the parties and their members. Simultaneously, that denial would significantly reduce the effectiveness of the votes of all qualified voters in this state, regardless of their political

persuasion, thus infringing their constitutionally protected right to cast their votes effectively.

> "[T]he right to exercise the franchise includes the right to cast one's vote effectively . . . whether that effectiveness be measured quantitatively . . . or qualitatively." Political parties enhance effective suffrage through collective support of candidates and policies. Within the context of partisan primaries, then, the right to vote takes on certain aspects of a group, rather than a purely personal, right. Not only the right of individuals— whether members or nonmembers of the party—to vote is involved. The right of the party to select a candidate acceptable to the party membership, that is, "to remain as a single coalition in the general election," is also affected. In this context, "the right of individuals to associate for the advancement of political beliefs" overlaps "the right of qualified voters . . . to cast their votes effectively;" the right to vote becomes a function of association.

(Footnotes omitted.) Note, *Primary Elections: The Real Party in Interest,* 27 Rutgers L. Rev. 298, 302 (1974).

Because interference with the freedom of a political party to exercise an effective role in the nomination of its candidates is simultaneously an interference with the fundamental, associational rights of its adherents, *Democratic Party,* at 122; *Sweezy v. New Hampshire,* 354 U.S. 234, 1 L. Ed. 2d 1311, 77 S. Ct. 1203 (1957), infringement of that freedom can only be justified by a compelling state purpose. *Cousins,* at 489; *Williams v. Rhodes,* 393 U.S. 23, 21 L. Ed. 2d 24, 89 S. Ct. 5 (1968). No such purpose appears in this case, however.

## Conclusion

It is true that Senator Jackson's untimely death on September 1 created a vacancy only 68 days prior to the state November 8 general election, and that this is a comparatively short time in which to conduct a statewide campaign. But while shortness of time can justify deferral of an election, *see State ex rel. Ferguson v. Superior Court,* 140 Wash. 636, 250 P. 66 (1926), it is not sufficiently compelling

to deprive a political party of its constitutional right to participate in the nomination of its candidate.

It is especially crucial, where time to mount an effective campaign is short, that candidates accurately reflect the views and principles of the party in whose name they run, since party affiliation may in such cases be a determinative factor in the minds of the voting public. Potential solutions are available to meet the State's interest in conducting an orderly election, but which would allow political parties participation in the candidate selection process. The 3–day open filing period is "[m]ore of an intrusion on the party's fundamental right of association than is required . . ." to protect the State's interest and, therefore, in my opinion is unconstitutional. *Langone v. Secretary of the Commonwealth*, 446 N.E.2d at 46.

It seems incongruous to me that our Supreme Court, possessor of awesome constitutional powers, sidestepped a rather simple solution, to uphold the constitution and to permit the majority of our voters through a primary election to accurately reflect their choice for the office of United States Senator.

I would have directed the Secretary of State, the chief election officer, to cause a primary election to be set and held prior to the general election to fill the vacant and unexpired term of United States Senator in the state of Washington.